**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| WILLIAM R. OWENS, |
| Plaintiff, |
| |
| v. |
| |
| SADSBURY TOWNSHIP et al., |
| Defendants. |

Civ. No. 07-742

Pollak, J.                                                                       September 30, 2008

**OPINION**

Plaintiff William R. Owens brings this action against Sadsbury Township,

Pennsylvania, a municipal corporation for which he was employed, and three members of

the Township's Board of Supervisors.  Before the court is defendants' motion for partial

summary judgment as to claims brought under 42 U.S.C. § 1983.  Docket No. 15.  For the

reasons that follow, the motion will be denied.

**I. Background**

Sadsbury Township is governed by a three-person Board of Supervisors (the

"Board"), which, during the relevant period, consisted of defendants Douglas Doratt,

Dale Hensel, and Ralph Garris, Jr.  Mr. Garris, Chairman of the Board of Supervisors,

was charged with appointing his fellow supervisors to serve as administrators for the

Township.  In this capacity, Mr. Garris assigned Mr. Hensel to execute the duties of the

Township's "road master" (though Mr. Garris retained that formal title).  As acting road master, Mr. Hensel had direct supervisory authority over the Township's "roads foreman," the day-to-day manager of the Township's three part-time road workers.  Def. Ex. 3 at 20.  In July 2004, the Board fired the Township's roads foreman, Douglas McGuigan, Pl. Ex. F. at 93, and gave the position to plaintiff William Owens, who had theretofore been a part-time road worker.  Def. Ex. 3 at 10-15.  Then, in October 2005, the Board terminated Mr. Owens's employment.  The parties contest the circumstances of this dismissal.

**A.**

Mr. Owens contends that he was terminated because of his friendly interactions with one of the Board's political opponents, Stephanie Silvernail –- a connection which, plaintiff contends, defendants perceived to reflect a lack of political loyalty on Mr. Owens's part.  The local politics of Sadsbury Township, as they are described in the parties' submissions,[1] provides necessary context for this claim.

In the mid-1990's, while defendants Doratt and Garris were members of the Board of Supervisors, a citizens group was formed in Sadsbury Township to address land development issues.  Pl. Exs. A at 16; B at 7; C at 6.  Douglas McGuigan — the roads

---

[1] These submissions include depositions taken during discovery in an action brought against the same defendants by Douglas McGuigan, the Township's roads foreman prior to plaintiff, which has since settled.  *See McGuigan v. Sadsbury Township et al.*, No. 06-78 (E.D. Pa. filed January 6, 2006).

foreman whom the Board, years later, in 2004, was to fire and replace with plaintiff —
was a founder of the group and hosted the group's meetings at a fire station to which he
had access as a trustee of the fire department.  Pl. Ex. F. at 73-74.  Both Ms. Silvernail
and her husband, Robert Silvernail, attended meetings of the group.  Pl. Exs. D at 12;
E at 8.

      In 1996 and 1998, respectively, two members of the citizens group won election to
the Board of Supervisors, giving the group's members a majority vote on the Board.  Pl.
Ex. A. at 6, 16.  In the 1998 election, the citizens group member defeated Mr. Doratt, then
an incumbent.  *Id.* at 38.  Mr. Doratt again ran for election in 2001, this time successfully.
Pl. Ex. B. at 7.  In 2001, Ms. Silvernail unsuccessfully challenged defendant Hensel in
both the primary and the general election for the Board of Supervisors.  Pl. Ex. D. at 5-6.
(Ms. Silvernail was ultimately elected to the Board of Supervisors in the fall of 2005,
subsequent to the events in dispute.  *Id.* at 5).

      The relationship between the individual defendants and the Silvernails was,
according to plaintiff's submissions, acrimonious.  In a deposition, Mr. Garris described
Mr. Silvernail as "nuts," and testified that Mr. Silvernail would frequently interrupt
meetings of the Board to voice objections concerning development-related issues.  Pl. Ex.
B. at 18-19.  Mr. Silvernail testified in a deposition that, in public Board meetings, Mr.
Garris would tell him "not to ask stupid questions," and both Mr. and Ms. Silvernail
testified that, at one such a meeting, Mr. Garris told Mr. Silvernail to "shut up."  Pl. Exs.

D at 16; E at 6-7.  Mr. Silvernail described Mr. Doratt's attitude toward him as "pretty

much the same as Mr. Garris."  Pl. Ex. E at 7.  While Mr. Silvernail testified that Mr.

Hensel was not overtly hostile toward him, *id.*, Mr. McGuigan testified that, once, when

he was speaking with Ms. Silvernail at the post office, Mr. Hensel "drove past and stared

. . . the whole time he drove past.  And he just had that look on his face like 'what are you

doing standing here and talking to these people.'"  Pl. Ex. F. at 84.

In late 2003, following Ms. Silvernail's loss to Mr. Hensel in the November

general election, the Board terminated the Silvernails from positions that they had held

with the Township.  The Board declined to reappoint Ms. Silvernail to a position on the

Township's Planning Commission, on which she had served for eight years.  Pl. Ex. D. at

7.  The Board of Supervisors also declined to reappoint Mr. Silvernail to his position on

the Zoning Hearing Board, on which he had served for five years.  Pl. Ex. E. at 5.

In July 2004, six months after Mr. Hensel took office, the Board of Supervisors

fired Mr. McGuigan from his position as roads foreman.  Plaintiff alleges that this

termination, like his own, was politically motivated.  Mr. McGuigan testified that, in

September or October 2003, Messrs. Doratt and Garris called him into their office and

asked who was allowing the citizens group to hold their meetings in the fire station.  Pl.

Ex. F at 77-79.  Mr. McGuigan responded that he and the other trustees of the fire

department permitted the meetings to be held there.  *Id.*  In July 2004, the Board held a

private meeting with Mr. McGuigan and the town solicitor, and informed Mr. McGuigan

that he was being terminated due to "safety issues." *Id.* at 94. Mr. McGuigan testified that this meeting came as a surprise. *Id.*

Mr. Owens alleges that between the time he was promoted to roads foreman in July 2004 and he was terminated in October 2005, defendants learned of his amicable relationship with Stephanie Silvernail. Mr. Owens was not a member of the Silvernails's citizens group and does not claim to have been close friends with Mr. or Ms. Silvernail, or even to have socialized with them. Pl. Ex. H. at 95-96, 99. However, Mr. Owens attended high school with Robert Silvernail and had a friendly rapport with him and his wife. *Id.* at 95-96. When he would meet Ms. Silvernail in public, Mr. Owens testified, he would say hello to her and, occasionally, stop and exchange pleasantries. *Id.* at 97. Mr. Owens testified that, "numerous times," Mr. Hensel observed him having such interactions with Ms. Silvernail in front of the Township's building. *Id.* at 103. According to Mr. Owens, on three or four occasions Mr. Hensel asked him what Ms. Silvernail was asking him and what the nature of the conversation was. *Id.* at 104.

   **B.**

Defendants claim that their termination of Mr. Owens did not stem from his interactions with Stephanie Silvernail, but from his work performance. In an October 2005 termination letter to Mr. Owens, the Board identified four examples of Mr. Owens's misconduct. Def. Ex. 4.

   **1.**

First, the Board charged that Mr. Owens engaged in a "clear act of insubordination" by misreporting his overtime for October 8, 2005. *Id.* at 1-2. Mr. Owens, who was not scheduled to work on October 8, submitted a time card reporting that he worked from 12:00 p.m. to 6:30 p.m. that day. Pl. Ex. H at 37; Def. Ex. 9. On October 10, the Board sent a memorandum to Mr. Owens "requesting verification of the work that was done" by him on October 8 and asking him to provide "[a] description of what was accomplished in 6 hours." Def. Ex. 10. Defendants claim that "[p]laintiff responded by writing the word "nothing." Docket No. 15 at 5. Mr. Owens contends that he did not provide such a response to the memorandum, but instead wrote "nothing" on the memorandum out of frustration with the request and left the memorandum on his desk, without submitting it to the Board. Pl. Ex. H at 61-62.

Mr. Owens claims that his frustration stemmed from his having, on October 8, reported to Mr. Hensel on the significant amount of work that he did that day. *Id.* at 65. On October 8, the Township was hit by heavy rain, which flooded one of its creeks. Mr. Owens testified that, between 11:30 a.m. and noon, a Township police officer, Scott Viola, came to his house to ask for his assistance in closing off the roads. *Id.* at 37-39. According to this testimony, Mr. Owens unsuccessfully attempted to call Mr. Hensel, his supervisor, and then, per emergency protocol, contacted Mr. Garris and alerted him to the situation. *Id.* at 39-42. Mr. Owens then proceeded to load the Township's barricades into his truck, *id.* at 42-43, spray-paint a salt spreader while awaiting the arrival of a co-

worker, *id.* 42-46, check the roads and bridges, *id.* at 48-52, barricade and close roads, *id.*, assist someone who was trapped in his yard by the rising water, *id.* at 48-49, and assist another person whose car was stuck on a flooded road, *id.* at 93.  Between 3:30 and 4:00 p.m., while returning home for a sandwich, Mr. Owens spoke again to Mr. Garris, who asked him to check roads on the northern side of the Township.  *Id.* at 56.  Mr. Owens did so and then, between approximately 5:30 and 6:00 p.m., drove to see Mr. Hensel to report on the work that he performed that day.  *Id.* at 57.  At approximately 6:30 p.m., Mr. Owens left Mr. Hensel, removed some barricades, and closed another road before completing his workday.

However, defendants contend that Mr. Owens did not properly account for his time that day.  According to police officer Viola's daily activity log, he did not contact Mr. Owens until 1:30 p.m.  Mr. Hensel testified that, at 1:00 p.m., he and Mr. Doratt saw Mr. Owens and another individual in a truck, without barricades loaded into it, simply watching the creek flood over a bridge.  Def. Ex. 2 at 17.  Mr. Hensel testified that when he next saw Mr. Owens, at approximately 5:00 p.m., Mr. Owens was dressed in dry street clothes and accompanied by his fiancee.  *Id.* at 20-21.  These observations, according to Mr. Hensel, prompted him to doubt the accuracy of plaintiff's overtime reporting.

**2.**

The second example of misconduct cited in the termination letter concerns Mr. Owens's reporting of his whereabouts on October 13, 2005.  Mr. Hensel testified that, on

that morning, he observed a Township truck parked outside a Burger King restaurant.

Def. Ex. 2 at 13.  Through the Township Secretary, Mr. Hensel instructed Mr. Owens to

call him, and Mr. Owens did so as he was leaving the Burger King.  *Id.*; Def. Ex. 5 at 18.

Both Mr. Hensel and one of Mr. Owens's employees, David Turner, testified that, during

that call, Mr. Owens told Mr. Hensel that he was reading meters.  Def. Exs. 2 at 13; 5 at

18.

The termination letter reports that, on October 13, Mr. Owens "told Mr. Hensel on

the cell phone that [he was] on a road job, when at the very same time Mr. Hensel was

observing [him] at Burger King."  Def. Ex. 4 at 1.  Mr. Hensel testified, however, that Mr.

Owens told him that he had been at the Burger King using the bathroom, and, when

calling him, was reading meters.  Def. Ex. 2 at 12.  (Mr. Owens testified that he and Mr.

Turner ate at the Burger King in addition to using the bathroom.  Def. Ex. 3 at 69.)

**3.**

The third example of misconduct identified in the termination letter is expressed as

follows:  "There have been other serious matters regarding your performance as Road

Crew Foreman as documented in your personnel file, including most recently issues

between you and the roads members as documented the [sic] Order of the Board of

Supervisors dated August 19, 2005."  Def. Ex. 4 at 2.  The described order, which

plaintiff submits with his opposition papers, documents a Board meeting that was held —

as the Board characterized it in the order — "to express concerns and gripes that the Road

Crew members had with each other." Pl. Ex. J at 2. The document indicates that one of

the road crew members complained that Mr. Owens instructed him to close roads by

himself, did not permit the road crew to communicate with each other while on the job,

and compelled him to work from 7:00 a.m. to 2:00 p.m. without a break for a lunch hour.

*Id.* at 1. The Board addressed these complaints by requiring roads to be closed by two

persons and allowing the worker to have a lunch hour if he worked past noon. *Id.*

Another road crew member complained that Mr. Owens would not permit him to go home

for lunch or make personal calls at work. *Id.* The Board resolved these concerns by

clarifying that road workers could go home for family reasons "in certain situations," and

that personal calls were permitted if not made excessively. *Id.* For his part, Mr. Owens

complained about the work attendance of one of the crew members. *Id.* at 1-2.

According to the order, the Board assured the roads members, at the meeting, "that no

repercussion should come out of [the meeting] against the members." *Id.* at 2.

     **4.**

     Finally, the termination letter states that Mr. Owens "unilaterally informed the

Township that he would no longer make One Call inspections despite having performed

this work in the past as part of [his] job." Def. Ex. 4 at 2. Mr. Owens testified that this

complaint refers to inspections for underground utility lines. Plaintiff submitted evidence

of the technical nature of these inspections. Pl. Exs. H at 86; I. According to Mr.

Owens's testimony, he stopped performing these inspections because he did not feel

qualified to do so.  Pl. Ex. H. at 86-87.  Mr. Owens further testified that, on numerous

occasions, he gave Mr. Hensel information about the safety courses offered by the state

on how to conduct these inspections, but that Mr. Hensel "never commented" on this

information.  *Id.* at 87.

### C.

Following his termination, plaintiff filed the instant action alleging that he was

fired because of his perceived failure to support the politics of the Board's members, as

reflected by his interactions with Stephanie Silvernail.[2]

## II. Analysis

Defendants move for summary judgment on plaintiff's claim, pursuant to 42

U.S.C. § 1983, that he was fired for his perceived lack of political support for the

individual defendants.  Summary judgment on this claim is warranted if "the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue for

trial, the court views the evidence in the light most favorable to the non-moving party,

drawing all "justifiable inferences" from the evidence in the nonmovant's favor.  *Id.* at

249.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[2] Plaintiff also brings a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for the overtime pay that he claims to have earned on October 8, 2005, the day of the flood.  This claim is not presently before the court.

**A.**

It has long been settled that the First Amendment protects government employees,

except those who occupy policymaking positions, from being "discharged or threatened

with discharge solely because of their partisan political affiliation or nonaffiliation."

*Elrod v. Burns*, 427 U.S. 347, 349 (1976) (plurality opinion); *see also Branti v. Finkel*,

445 U.S. 507 (1980) (reaffirming *Elrod*'s holding); *Rutan v. Republican Party of Ill.*, 497

U.S. 62 (1990) (holding that adverse employment actions protected by the First

Amendment from being conditioned on political affiliation are not confined to firing and

non-hiring); *Bennis v. Gable*, 823 F.2d 723 (3d Cir. 1987) (holding that the First

Amendment protected police officers who campaigned for an unsuccessful mayoral

candidate from being demoted for failing to support the successful candidate).

Defendants argue, however, that plaintiff, who was not registered to vote and was not

politically aligned in opposition to the Board, has not engaged in the sort of associative

activity that is entitled to this constitutional protection.

Defendants' argument is foreclosed by *Galli v. N.J. Meadowlands Comm'n*, 490

F.3d 265 (3d Cir. 2007), in which the Third Circuit held that "First Amendment rights to

freedom of speech and association protect government employees who *lack* a political

affiliation from political patronage discrimination."  490 F.3d at 268 (emphasis added);

*see also id.* at 276 ("We hold that the First Amendment protects politically neutral or

apolitical government employees from political patronage discrimination.").  The plaintiff

-11-

in *Galli* claimed to have been fired from her position with the state of New Jersey for failing to support the Democratic governor's administration.  However, like plaintiff in the instant case, the plaintiff in *Galli* was not registered with a political party while working for the state, "never shared her political views with her supervisor and was not asked to participate in any partisan political activity." *Id.* at 268.  The district court awarded summary judgment to defendants on the ground that the plaintiff "could not establish that she engaged in constitutionally protected activity because she was unaffiliated with any political party and disinclined to be active politically." *Id.* at 269. The Third Circuit reversed, concluding that the First Amendment secures a right to decline to engage in the political process and affirming that "a public employee, not in a policymaking position, may not be fired for failing to support the political party or candidate in power." *Id.* at 274.

Thus, under *Galli*, plaintiff's asserted lack of political involvement does not disqualify him from protection from being fired for failing to support the politics of the Township's supervisors.

**B.**

Plaintiff has asserted a cognizable First Amendment claim, and may overcome defendants' motion for summary judgment by, first, putting forth a *prima facie* case of political patronage discrimination, which requires a plaintiff to show that: "(1) she was employed at a public agency in a position that does not require political affiliation, (2) she

-12-

was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli*, 490 F.3d at 271 (citations and internal quotation marks omitted). "Once [a plaintiff] makes this demonstration, the [defendant] may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Id.*

Defendants do not contest that plaintiff has submitted evidence establishing the first element of a *prima facie* case under *Galli* — namely, that plaintiff's position as roads foreman was not one calling for political affiliation. As for the second element of plaintiff's *prima facie* case, the discussion above establishes that non-affiliation with any political grouping is itself constitutionally protected conduct. Therefore, the remaining questions are (1) whether plaintiff has tendered evidence that his perceived lack of political support for the Board's members was "a substantial or motivating factor in the government's employment decision" (thus completing plaintiff's *prima facie* case) and, if so, (2) whether defendants have "prov[ed] by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Id.*

1.

In addition to demonstrating that he did not actively support the politics of the Board of Supervisors, plaintiff has submitted evidence showing that this political choice

-13-

was "a substantial or motivating factor" in the Board's decision to terminate his employment. As detailed above, plaintiff's submissions show that the individual defendants were emphatically hostile to their political opponents, including Robert and Stephanie Silvernail, and that the previous roads foreman, who was also terminated from his position, was politically aligned with the Silvernails. According to these submissions, Mr. Hensel had directed angry looks toward plaintiff while observing him engaging in friendly discussions with Ms. Silvernail and questioned plaintiff about the nature of these discussions. Within months of this questioning, plaintiff was removed from his position. This evidence, if credited, could demonstrate to a reasonable factfinder that the Board was willing to take adverse employment actions against those who did not demonstrate adequate political loyalty to its members. A reasonable factfinder could also infer from this evidence that plaintiff's interactions with Ms. Silvernail aroused defendants' suspicion that plaintiff was not sufficiently loyal to the politics of the Board's members, and that the Board's termination of plaintiff's employment was driven, at least in substantial part, by this suspicion. I therefore conclude that plaintiff has established a *prima facie* case of political patronage discrimination.

**2.**

Defendants contend that, regardless of whether plaintiff put forth a *prima facie* case of political patronage discrimination, their submissions prove, by a preponderance of the evidence, that they would have fired plaintiff regardless of his failure to give adequate

political support to the Board's members.  In their summary judgment motion, defendants argue that plaintiff's termination was motivated, and justified, by two instances of misconduct.  First, plaintiff wrote the word "nothing" in response to the Board's request that he account for his overtime reporting for October 8, 2005.  Second, plaintiff was, to borrow defendants' characterization, "not candid" in his response to Mr. Hensel's inquiry about what he was doing on October 13, 2005, when Mr. Hensel observed a Township truck parked outside a Burger King.

However, plaintiff has supplied evidence that, if credited, would show that these reasons did not truly motivate the Board's action against plaintiff, but — to the contrary — were such obvious pretexts that, from them, one can infer that the Board's actions against plaintiff were the product of political animus.  With respect to plaintiff's overtime reporting for October 8, plaintiff testified that he wrote "nothing" in a moment of frustration, but left this response on his desk without submitting it to the Board. According to plaintiff, his frustration owed to the Board's failure to acknowledge the considerable amount of work that he performed for the Township on October 8, despite his having already given Mr. Hensel an account of this work.  As to plaintiff's October 13 conversation with Mr. Hensel, the Board's termination letter reports that plaintiff "told Mr. Hensel on the cell phone that [he was] on a road job, when at the very same time Mr. Hensel was observing [him] at Burger King."  However, Mr. Hensel testified that plaintiff told him, during the call in question, that he had been at the Burger King using the

bathroom and that, at the time of the call, he was reading meters.   The reasons for dismissal stated in the termination later are further exposed as pretexts, according to plaintiff, by the fact that the letter cites the problems that were aired at an August 19 Board meeting, despite the Board having reassured the roads members, at the meeting, "that no repercussion should come out of [the meeting] against the [roads] members."

In summary, the evidence, cast against plaintiff's submissions and viewed in the light most favorable to the non-moving party, shows that there is a material issue of fact as to whether plaintiff was fired for failing to tender political support to the individual defendants.  If a factfinder were to resolve that factual issue in plaintiff's favor, that finding could ground a determination that the firing of Mr. Owens was unconstitutional.

## C.

Finally, the individual defendants argue that, even assuming *arguendo* that their action, as Township Supervisors, in firing plaintiff was unconstitutional, they are entitled to qualified immunity.  Qualified immunity protects government officials when their "conduct does not violate clearly established constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In deciding whether qualified immunity should be granted at the summary judgment stage, the court "appropriately may determine, not only the currently applicable law, but whether the law was clearly established at the time an action occurred."  *Id.*

The Supreme Court has constructed a two-tier framework for evaluating whether a

government official is entitled to qualified immunity:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."  If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case."

*Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 200

(2001)).  In the instant case, I have already concluded that plaintiff's evidence, if credited,

may show that defendants fired him in violation of the First Amendment's proscriptions

against political patronage discrimination.  The "initial inquiry" is therefore complete.  I

thus turn to whether the asserted First Amendment right is "clearly established . . . in light

of the specific context of the case."  *Id.*

The Supreme Court makes clear that, in determining whether a constitutional right

is "clearly established," one ought not conceptualize the right at a high level of generality.

*Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Instead,

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.*  "It is important to emphasize that this inquiry 'must be undertaken in light of the

specific context of the case, not as a broad general proposition.'"  *Brosseau v. Haugen*,

543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 201).  Accordingly,

the Third Circuit has held that, for a "clearly established" right to have been violated,

"'there must be sufficient precedent at the time of the action, factually similar to the

plaintiff's allegations, to put [the] defendant on notice that his or her conduct is

constitutionally prohibited.'"  *McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (quoting

*McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)).

Long before the events in dispute, the Third Circuit "observed that it was 'clearly

established' that public employees could not be fired for their political affiliation."  *Burns*

*v. County of Cambria*, 971 F.2d 1015, 1024 (3d Cir.1992).  Defendants contend, however,

that, at the time of plaintiff's termination, the contours of this right were not sufficiently

clear to guide the individual defendants' conduct in this context, where the record shows

that plaintiff held no strong political views of his own and was not invested in the

political aims of the defendants' opponents.  Defendants argue that, prior to the Third

Circuit's holding in *Galli*, it was not "clearly established" that a public employee could

not be fired where, as in these circumstances, he engaged in activities that were not

political as such, but which defendants perceived to be politically disloyal.

This argument is unavailing.  In *Galli*, the court made clear that its holding —

"that the First Amendment protects politically neutral or apolitical government employees

from political patronage discrimination" — was compelled by a series of long-established

Supreme Court precedents.  *See Galli*, 490 F.3d at 272 ("Indeed, '[t]he threat of dismissal

-18-

for failure to provide [] support [to the party in power] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise.'") (brackets in original) (quoting *Elrod*, 427 U.S at 359). The court took care, in responding to a dissenting opinion, to stress "the breadth with which the Supreme Court stated its . . . holdings" in *Elrod* and in *Branti*. *Id*; *see id.* 273-74 (characterizing *Elrod* as "holding that the plaintiff public employees could not be discharged 'solely for the reason that they were *not affiliated* with or sponsored by the Democratic party'") (quoting *Elrod*, 427 U.S. at 350 (emphasis added)); *id.* at 274 (characterizing *Branti* as "holding that 'the continued employment of an assistant public defender cannot properly be conditioned upon his *allegiance to the political party in control*") (quoting *Branti*, 445 U.S. at 519 (emphasis added)). The court also noted the Third Circuit's observation, in 1987, that "'a citizen's right not to support a candidate is every bit as protected as his right to support one.'" *Galli*, 490 F.3d at 272 (quoting *Bennis*, 823 F.2d at 731; *see also Bennis*, 823 F.3d at 731 ("Freedom of association . . . plainly presupposes a freedom not to associate.") (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)). After reciting the holdings of these cases, the *Galli* court concluded that "*Elrod*, *Branti* and *Bennis* all stand for the proposition that a public employee, not in a policymaking position, may not be fired for failing to support the political candidate in power." *Galli*, 490 F.3d at 274. The discrimination alleged by the plaintiff in the case before it, the *Galli* court determined, fell well within scope of these Supreme Court holdings.

-19-

Though the *Galli* court was not called upon to address the issue of qualified immunity, the Tenth Circuit, in a similar setting, held that an apolitical public employee who charged that she was fired for failing to actively campaign for a county commissioner could pursue a political discrimination claim against the county commissioner.  *Gann v. Cline*, 519 F.3d 1090 (10th Cir. 2008).  In doing so, the Tenth Circuit "reject[ed the county commissioner's] argument that, at the time of his conduct, the First Amendment right to 'non-affiliation' was not clearly established."  *Id.* at 1095. Its rejection, the court concluded, was compelled by an earlier Tenth Circuit opinion, but also by what the Supreme Court had "clearly held," *id.*, in *Elrod*, 427 U.S. at 350,  *Branti*, 445 U.S. at 517, and *Rutan*, which, according to the *Gann* court, held that the First Amendment "protects 'employees' freedom to believe and associate, *or to not believe and not associate*.'"  *Gann*, 519 F.3d at 1095 (quoting *Rutan*, 497 U.S. at 78 (emphasis added)).  The plaintiff in *Gann* was terminated on April 5, 2005.  519 F.3d at 1092. Owens, the plaintiff in the case at bar, was terminated in October of 2005.

I conclude that, under the facts presented here — where, as in *Galli* and *Gann*, an apolitical employee was allegedly fired for not demonstrating adequate political loyalty to the defendants — plaintiff has asserted a constitutional violation that was "clearly established" under *Rutan* and the precedents discussed in *Galli*.  These precedents were sufficiently clear to place the individual defendants on notice that, although plaintiff was apolitical, he could not be terminated because of his relationship with one of the Board

members' political opponents.

In sum, on the record before this court, there is evidence from which a factfinder could reasonably conclude that the individual defendants violated a clearly established constitutional right. Therefore, summary judgment in the individual defendants' favor on the issue of qualified immunity is not warranted.

## III. Conclusion

Plaintiff, as a public employee who does not hold a policymaking position, has invoked a cognizable First Amendment right against discrimination based on his lack of political affiliation. Plaintiff has proffered evidence that, if accepted as true, would prove that this right was violated. Plaintiff may therefore continue to pursue his § 1983 claim against Sadsbury Township and — because I conclude that, at the time of the individual defendants' conduct, the asserted right was "clearly established" under Supreme Court and Third Circuit precedents — against the individual defendants, Messrs. Doratt, Garris and Hensel. Therefore, in the accompanying order, I will deny defendants' motion for partial summary judgment.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM R. OWENS,
                Plaintiff,

    v.

SADSBURY TOWNSHIP et al.,
                Defendants.

Civ. No. 07-742

**ORDER**

**AND NOW**, this 30th day of September, 2008, for the reasons stated in the accompanying opinion, defendants' motion for partial summary judgment, Docket No. 15, is **DENIED**.

BY THE COURT:


   /s/ Louis H. Pollak     
Pollak, J.

-22-